QUANTACHROME CORPORATION, Plaintiff,

v.

MICROMERITICS INSTRUMENT CORPORATION, Defendant.

No. 96–8224–CIV.

United States District Court, S.D. Florida.

May 23, 2000.

Michael J. Higer, Mintz, Trupman, Clein, & Higer, P.A., North Miami, FL, Robert M. Schwartz, Robert M. Schwartz, P.A., Miami, FL, Barry R. Davidson, Hunton & Williams, P.A., Miami, FL, for plaintiff.

Connis O. Brown, Seth Robert, Gunster, Yoakley & Stewart, P.A., West Palm

Beach, FL, Holmes J. Hawkins, Jones & Askew, L.L.P., Atlanta, GA, Albert S. Anderson, Patent Law Offices of Albert S. Anderson, Norcross, GA, for defendant.

## ORDER

GONZALEZ, District Judge.

**THIS CAUSE** has come before the Court upon the non-jury trial of this matter, and upon Quantachrome's Motion to Reconsider Court's Claim 27 Orders, filed March 30, 2000. The Court, having reviewed the record and having considered the evidence and arguments presented at trial, makes the following findings and conclusions.

## I. BACKGROUND

Quantachrome and Micromeritics are competing companies engaged in the manufacture of pycnometers. Micromeritics is the holder of United States Patent No. 5,074,146 (the " '146 Patent") and alleges that Quantachrome's Ultrapycnometer 1000 infringes its patent.

The patent at issue in this case deals with a static volume pycnometer. A pycnometer is a device that measures the volume of a solid substance by using a type of gas displacement analysis. A static volume pycnometer typically involves two sealable chambers: a sample chamber [1] containing a sample of a substance and an empty chamber (expansion chamber).

In operation, a sample is placed in the sample chamber and gas is introduced into that chamber and pressurized. The pressure is then measured. Next, a valve opens and the gas expands into the expansion chamber. The pressure is measured in the combined volume of both chambers, and the result is compared to calibration data to determine the volume of the sample.[2] This volume measurement is in turn used to determine the density of the sample substance by dividing the mass of the substance by the volume.

The present suit was originally brought by Quantachrome for declaratory judgment of non-infringement of Micromeritics' patent and of invalidity of the same. Micromeritics counterclaimed alleging infringement of its patent.

In October 1996, Quantachrome moved the Court for a stay of the instant proceedings to allow reexamination of the '146 Patent by the United States Patent and Trademark Office ("PTO"). Quantachrome argued primarily that a stay was appropriate to allow the PTO to consider the Batchelor Patent which was not before it during the initial examination. The PTO granted Quantachrome's request for reexamination, and the Court granted Quantachrome's Motion to Stay. On June 9, 1998, the PTO issued its reexamination certificate confirming the patentability of the '146 Patent. (*See* Reexamination Certificate B1 5,074,146).

Subsequently, Quantachrome moved for summary judgment of non-infringement, and Micromeritics moved for summary judgment of liability. Micromeritics' Motion concentrated on Claim 27 of the '146 Patent.[3] On February 17, 1999, the Court

---

1. The sample chamber may also be referred to as the sample "cell."

2. The process can also work in reverse by pressurizing the empty chamber first and then expanding into the sample chamber.

3. The Court has previously referred to the separate limitations in Claim 27 by letter prefixes (a)–(f). These letter prefixes are not present in the patent. For purposes of clarity, the Court will continue to refer to these same letter prefixes. With the addition of the letter prefixes, Claim 27 reads as follows:

27. A pycnometer apparatus comprising
(a) a sample chamber;
(b) an expansion chamber connected by a passageway to said sample chamber,
(c) said sample and expansion chambers being positioned within an integral environment of high thermal conductivity;
(d) gas supply means for introducing a gas under pressure into one of said chambers;
(e) valve means for controlling flow of gas through said passageway;
(f) vent means for venting either of said chambers to atmosphere; and

granted summary judgment to Micromeritics on the issue of infringement of Claim 27. The Court then, on May 4, 1999, amended the previous order to allow the parties to address the defenses of laches and equitable estoppel. In the May Order the Court also held that Quantachrome had previously moved for summary judgment of invalidity of Claim 27. Accordingly, the Court held that Quantachrome should have put forth all arguments of invalidity at that time.

Micromeritics and Quantachrome subsequently filed motions seeking summary judgment on the remaining liability issues. On March 29, 2000, the Court granted in part Micromeritics' summary judgment motions. However, the Court found the existence of genuine issues of material fact on the question of obviousness. The Court found that there existed a genuine issue of material fact on the issue of whether the placement of the sample and expansion chambers in an integral environment of high thermal conductivity was obvious in view of the prior art.

On March 30, 2000, Quantachrome moved the Court to reconsider its February and May orders as to the validity of Claim 27. Quantachrome argued that newly discovered evidence rendered Claim 27 obvious.

At the pretrial conference and in its subsequent Order of April 18, 2000, the Court agreed to limit trial on this matter to the question of the obviousness of Claim 27. Therefore, the Court effectively agreed to reconsider its previous orders regarding the validity of Claim 27.

On May 1, 2000, trial in this matter began. Then, on May 4, 2000, after hearing three days of testimony and the arguments of counsel, the Court orally granted Micromeritics' motion for judgment on partial findings pursuant to Fed.R.Civ.P. 52(c). As discussed below, the Court

(g) means for measuring the pressure of said gas within said one of said chambers.

found, and finds, that Claim 27 of the '146 Patent is not invalid for obviousness.

## II. JURISDICTION

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) (diversity of citizenship), in that the action is between citizens of different states and the matter in controversy exceeds the sum of seventy-five thousand dollars ($75,000), exclusive of interest, costs, and attorneys fees. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a) because the action arises under Title 35 of the United States Code relating to patents.

Neither party contests this Court's personal jurisdiction.

## III. STANDARD ON RULE 52(c) MOTION

Rule 52(c) provides,

If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue[.]

Fed.R.Civ.P. 52(c). Once a court decides to grant a Rule 52(c) motion, the court must support such decision by findings of fact and conclusions of law as required by subdivision (a) of the rule. *Id.*

■ Rule 52(c) applies in cases where the court acts as both judge and finder of fact. Accordingly, the court resolves conflicts in the evidence and also makes credibility assessments. *See Stearns v. Beckman Instruments, Inc.,* 737 F.2d 1565, 1568 (Fed.Cir.1984). Moreover, in evaluating the evidence the court makes no special inferences in favor of the nonmoving party. *See Emerson Elec. Co. v. Farmer,* 427 F.2d 1082, 1086 (5th Cir. 1970)[4].

4. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), the Eleventh Cir-

## IV. DISCUSSION

Quantachrome challenges the validity of Claim 27 of the '146 Patent. Quantachrome alleges that Claim 27 was obvious in light of the prior art.

The only issue for this case is whether claim element (c), the positioning of the sample and expansion chambers within an integral environment of high thermal conductivity, was obvious at the time of the patent in light of the prior art.[5]

A patent is invalid if the differences between the subject matter of the patent and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to one of ordinary skill in the art. 35 U.S.C. §§ 102, 282 (1984). However, a patent is presumed to be valid, 35 U.S.C. § 282, and the party challenging a patent's validity has the burden to show invalidity by clear and convincing evidence. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1563 (Fed.Cir.1997).

The burden of proving the invalidity of a patent that has been subject to reexamination is even heavier than it would be in the absence of reexamination because the findings of the Patent Office are highly probative on the issues where prior art was considered. *See Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464 (Fed.Cir.1990); *see generally* 4 Ernest Bainbridge Lipscomb III, *Walker on Patents* § 15:10 (Supp.1999).

In order to prevail on its defense of obviousness, Quantachrome must show by clear and convincing evidence that the differences between the patented invention and the prior art are such that the patented invention as a whole would have been obvious at the time the invention was made

to a person having ordinary skill in the art. *See Kloster Speedsteel AB v. Crucible, Inc.*, 793· F.2d 1565, 1574 (Fed.Cir.1986). In making a determination of obviousness,

> [t]he consistent criterion ... is whether the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success, viewed in the light of the prior art.

*In re Dow Chemical Co.*, 837 F.2d 469, 473 (Fed.Cir.1988). Additionally, in making a determination on the issue of obviousness, the Court must return to the time the invention was made, and view the invention "not with the blueprint drawn by the inventor, but in the state of the art that existed at the time[.]" *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050–51 (Fed.Cir.1988) (citation omitted).

The determination of obviousness is a question of law based on several factual inquiries: (A) the scope and content of the prior art; (B) the differences between the prior art and the claim at issue; (C) the level of ordinary skill in the art at the time when the invention was made; and (D) objective evidence of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

As instructed by the Federal Circuit, the Court will systematically present its obviousness analysis in terms of the four enumerated *Graham* factors. *See Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 990 (Fed.Cir.1988).

### A. THE SCOPE AND CONTENT OF THE PRIOR ART

The first consideration under *Graham* is the scope and content of the prior art. Prior to determining the content of the prior art, "it must be known whether a

---

cuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

**5.** As discussed in the Order of February 17, 1999, Quantachrome concedes that six of the

limitations in Claim 27 read on the accused device. *Id.* at 7. Quantachrome asserts that element (f) does not read on the accused device. However, the Court previously found that element (f) and Claim 27 in whole read on the accused device. *Id.* at 10.

patent or publication is in the prior art under 35 U.S.C. § 102[.]" *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1568 (Fed.Cir.1987). Prior art consists of "knowledge that is available, including what would be obvious from it, at a given time, to a person of ordinary skill in an art." *Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1453 (Fed.Cir. 1984).

■ The scope of the relevant art includes that art "reasonably pertinent to the particular problem with which the inventor was involved." *In re GPAC Inc.,* 57 F.3d 1573, 1577 (Fed.Cir.1995) (citation omitted). To decide whether a reference constitutes relevant prior art the Court must determine (1) whether the reference is within the inventor's field of endeavor, and (2) if not, whether the reference is reasonably pertinent to the particular problem confronting the inventor. *See id.* at 1578.

As previously discussed, the inventor's field of endeavor in this case is static volume pycnometry. The particular problem confronting the inventor was attaining volume measurements and density calculations to a degree of precision and accuracy not previously available.

At trial Quantachrome argued that the prior art includes the following: United States Patent Number 4,095,473 (the "Batchelor Patent"); United States Patent Number 2,667,782 (the "Shea Patent"); Quantachrome's Stereopycnometer; a pycnometer developed by Gulf Oil (the "Gulf Oil pycnometer"); a pycnometer cell drawing dated 1979; drawings for the Ultrapycnometer dated 1991; the Stereopycnometer manual; and the Penta–Pycnometer manual.[6]

The Court finds that the Batchelor and Shea Patents clearly are relevant prior art. Likewise the Stereopycnometer and Pen-

ta–Pycnometer manuals are relevant prior art. Additionally, the Court finds that the Stereopycnometer device as constructed prior to the issuance of the '146 Patent is relevant prior art.

Quantachrome also argues that the Gulf Oil pycnometer is prior art. Quantachrome asserts that the Gulf Oil testimony indicates that prior to the date of the '146 Patent, the Gulf Oil employees working on the pycnometer project indeed developed a pycnometer in which the two chambers were placed within a solid block of either aluminum or stainless steel. Hence, Quantachrome asserts that the Gulf Oil pycnometer is prior art, and that it clearly teaches the placement of the sample and expansion chambers in an integral environment of high thermal conductivity.

■ While such pycnometer may indeed have taught the use of an integral environment of high thermal conductivity, it is not prior art. All of the Gulf Oil employees testified that at all times that they worked on this project, they were under a strict confidentiality agreement. Art that is not accessible for public knowledge does not qualify as prior art for a determination of obviousness. *See OddzOn Products, Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1402 (Fed.Cir.1997).

Moreover, the Gulf Oil employees testified that after the final version of the pycnometer was complete, Chevron (previously Gulf) decided not to use the device because it lacked the sought after accuracy. Thus, the Gulf Oil pycnometer was abandoned, suppressed, or concealed under § 102(g) because no steps were taken to make the invention publicly known within a reasonable time after completion. *See Surgical Laser Technologies, Inc. v. Laser Industries, Ltd.,* 29 U.S.P.Q.2d 1533, 1539 (E.D.Pa.1993), *aff'd,* 34 F.3d 1080, 1994 WL 449913 (Fed.Cir.1994) (table). In fact, the testimony indicates not only a failure

---

**6.** Quantachrome also discussed the Turner Patent and the Autopycnometer 1320. Both of these references are dual piston pycnometers which the Court previously held, in agreement with the PTO, are not relevant prior art. (*See* Order of March 29, 2000, at 7).

to make the invention public, but a positive decision to abandon the invention.

■ Essentially, the Gulf Oil pycnometer project amounted to no more than private experimentation. Devices used for private experimentation do not constitute prior art because they are not accessible for public knowledge. *See id.*

The Court likewise finds that the 1979 drawing and the 1991 Ultrapycnometer drawings do not qualify as relevant prior art. All of these drawings were kept in the private files of Quantachrome and were never disclosed to the public. In fact, as of the date of this Order, these drawings have been subject to extremely limited disclosure under an agreed upon confidentiality order.

## B. THE DIFFERENCES BETWEEN THE PRIOR ART AND THE CLAIM AT ISSUE

The next factor under *Graham* is the differences between the prior art and the claim at issue. None of the prior art references discloses the placement of both the sample cell and the expansion chamber in an integral environment of high thermal conductivity in order to alleviate the problems associated with internal and ambient temperature variations.

Among the examples of prior art the Court has considered are the Shea Patent, the Batchelor Patent, and the Stereopycnometer. The Court will confine its discussion to these prior art references.

First, Quantachrome argues that Shea discloses an integral configuration of the sample and expansion chambers. Additionally, Quantachrome asserts that Micromeritics admitted as much in its statements to the PTO.[7]

Whether Micromeritics stated such or not, the Court finds that Shea does not disclose such a configuration. Shea discloses two interconnected chambers which "may be arranged concentrically, in which event the inner chamber may be considered the sample chamber. Or the chambers may be disposed one above the other, in which the upper chamber is the sample chamber." (Shea, Col. 1, lines 28–33).

Such a configuration in no way teaches that the two chambers are to be placed adjacent to each other in an integral environment of high thermal conductivity. Additionally, upon viewing the representational figures in the Shea Patent, it is clear that the patent did not call for the chambers to be in such an integral environment.

In fact, the patent itself discusses two separate housings in which the chambers are contained. (Shea, Col. 8, lines 19–20). Although the patent mentions that these separate housings are "integral in construction," (*id.*, lines 22–23), it does not mandate the positioning of the two chambers within an integral environment of high thermal conductivity.

Moreover, Shea does not teach the necessity of such an environment. The purpose of the construction in Shea is to achieve ruggedness for use in field service. (*See id.*, Col. 1, lines 13–14). The purpose of the "integral" construction in Shea is not to reduce temperature variations.

Indeed, Shea negates the effect of temperature variations by dropping the temperature values out of the relevant equation. (*Id.*, Col. 2, lines 1–6). Hence, Shea does not teach the importance of eliminating subtle temperature variations between the two chambers through the use of an integral environment of high thermal conductivity.

Second, Quantachrome argues that the Batchelor Patent discloses the positioning of the two chambers adjacent to each other

---

7. At trial, Quantachrome argued at length that because of "misinformation," the patent examiner failed to properly evaluate the significance of Shea. This is an inequitable conduct argument, not an obviousness one. *See*

*Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.,* 81 F.Supp.2d 978, 985 (N.D.Cal. 1999). On March 29, 2000, the Court granted Micromeritics' summary judgment motion on the issue of inequitable conduct.

within an integral environment of high thermal conductivity.

Batchelor teaches the positioning of the sample and expansion chambers "sealed in a chamber ... maintained at a constant and uniform temperature." (Batchelor, Col. 2, line 42–43). The Court finds, as did the PTO, that Batchelor, while prior art, does not teach the positioning of the sample and expansion chambers within an integral environment of high thermal conductivity.

Quantachrome argues that the testimony of the inventors and others at Gulf Oil who worked on the pycnometer project indicates that it was their intent to use a solid block construction for the chamber within which the sample and expansion chambers would be sealed. Nonetheless, the intention of the inventor is not at issue because their intention is not the prior art. The patent is the prior art, and the patent does not disclose or teach the placement of the two chambers within an integral environment of high thermal conductivity.

Moreover, it was the testimony of Dr. Lynch, one of Batchelor inventors, that they originally planned to place the sample and expansion chambers in a heated air bath, not a solid block. He testified that the use of such an air bath for temperature control was easier than the use of a solid block and worked well enough for their purposes.

Thus, the Court finds that Batchelor does not teach the placement of the sample and expansion chambers in an integral environment of high thermal conductivity.

Third, Quantachrome argues that the use of an integral environment of high thermal conductivity was obvious from the design of the Stereopycnometer. Quantachrome asserts that the configuration of the Stereopycnometer with the two chambers held together by a metal bar taught the importance of the maintenance of high thermal conductivity between the chambers.[8]

Quantachrome argues that the two chambers are touching and in direct contact with each other and thus in an environment of high thermal conductivity.[9] However, as Quantachrome's own expert, Professor Panagiotopoulos testified, the surface area in contact is too small to have any real effect on heat transfer. Professor Panagiotopoulos testified that the metal bar[10] connecting the two chambers was the only real source of thermal conduction between the chambers.

Professor Panagiotopoulos testified that it is obvious that the purpose of the metal bar is for temperature control and that such would have been obvious to one of ordinary skill in the art. The Court disagrees. From the testimony at trial and from inspection of the Stereopycnometer, it appears that the primary function of the metal bar is to secure the expansion chamber in place. The Court finds that one of ordinary skill in the art would not infer from the construction of the Stereopycnometer that the metal bar served the purpose of temperature control, but that the metal bar served the purpose of securing the position of the expansion chamber.[11]

8. Additionally, Quantachrome argues that a 1979 drawing shows the intention that the two chambers be placed together in a single block. The testimony of Michael Porreca was that Quantachrome indeed built a research and design unit using the construction pictured in the drawing. Mr. Porreca further testified that the purpose of this design was to maintain temperature stability. However, as the Court has previously discussed, none of this was disclosed to the public, and it is therefore not prior art.

9. The Court previously held that the two chambers of the Stereopycnometer, while in contact, are not within an integral environment of high thermal conductivity. (See Order of February 17, 1999 (holding that Stereopycnometer did not anticipate Claim 27)).

10. Professor Panagiotopoulos also testified that he did not know and could not tell of what kind of metal the bar is made.

11. This is evidenced by the testimony of Professor Panagiotopoulos that even he, an ex-

Additionally, even if the bar was indeed used for the purpose of temperature control, and even if one of ordinary skill in the art would infer such, the Court finds that this does not teach the use of an integral environment of high thermal conductivity. If the use of the metal bar did teach the importance of temperature control, it by no means taught the importance of maintaining temperature control to such a small degree as taught by the '146 Patent. Therefore, the Court finds that one of ordinary skill in the art would not infer from the construction of the Stereopycnometer the importance of placing the sample and expansion chambers within integral environment of high thermal conductivity.

Next, while Quantachrome asserts that either Batchelor or Shea alone is sufficient to invalidate the '146 Patent, it also argues that those patents taken in combination with each other and the Stereopycnometer render Claim 27 obvious.

"Obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching, suggestion or incentive supporting the combination." *In re Bond,* 910 F.2d 831, 834 (Fed.Cir.1990). Likewise, it is not sufficient if the prior art discloses the components of the patented device, either separately or in combination, unless there exists a clear suggestion to make such a combination. *See Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 934 (Fed.Cir.1990) Essentially, "[s]omething in the prior art as a whole must suggest the desirability, and thus the obviousness, of making the combination." *Uniroyal,* 837 F.2d at 1051.

The Court finds that Quantachrome has failed to prove by clear and convincing evidence that one of ordinary skill in the art would have found in the prior art references some teaching, suggestion, or incentive to combine these prior art references in way that Micromeritics did in Claim 27. *See U.S. Surgical Corp.,* 103 F.3d at 1564.

The Court finds the Shea Patent especially lacking in any suggestion to combine it with the other referenced art for the purpose of eliminating the effects of temperature variations. Shea makes no reference to the importance of temperature control. Shea makes no attempt to imply that any "integral construction" had anything to do with temperature control. Rather, Shea makes clear that such a construction has to do with increasing the ruggedness of the device to make it more suitable for field use. In fact, Shea discounts the effects of temperature. Moreover, Shea discusses two distinct housings for the sample and expansion chambers and does not state outright or implicitly that these housings should be within an environment of high thermal conductivity.

Additionally, there was no suggestion to combine Batchelor and the Stereopycnometer. Although Batchelor and the Stereopycnometer may have both accounted for heat fluctuations, there is nothing to suggest that by combining the two one would further reduce the effects of such heat fluctuations.

Besides, even if there was some suggestion to combine these references, Quantachrome has failed to prove that the prior art would sufficiently teach or direct one of ordinary skill how to obtain the result reached by Micromeritics. *See U.S. Surgical Corp.,* 103 F.3d at 1564. As previously discussed, none of these prior art references teaches the use of an integral environment of high thermal conductivity. Likewise, neither does the combination of these references teach such a configuration.

In a nutshell, Shea may teach the use of some sort of integral construction, but even with such "integral construction," Shea teaches the use of two distinct hous-

---

pert in the field of thermodynamics, cannot tell what kind of metal the bar is. Surely, one of ordinary skill in the art upon routine in-

spection of the Stereopycnometer would not know if the bar is made of one of the more or less thermally conductive metals.

ings for the sample and expansion chambers. Batchelor, while recognizing the importance of temperature variations, teaches only that the two chambers must be maintained within another chamber, but does not discuss the construction of that chamber. As the Court has already noted, even an inventor of the Batchelor Patent indicated that the inventors originally planned to fill that chamber with a hot air bath. The Stereopycnometer at best teaches that it is important to have a source of thermal conduction between the two chambers. The connection of the two chambers by a metal bar does not teach the kind of thermal conductivity that is created by the use of an integral environment of highly thermally conductive material.

The result of a combination of Batchelor and the Stereopycnometer would be a pycnometer with a sample chamber and an expansion chamber connected by a metal bar placed inside some other enclosure. Similarly, the result of a combination of Batchelor, Shea, and the Stereopycnometer would be a pycnometer with sample and expansion chambers in separate and distinct housings but constructed integrally and placed in an enclosure with some sort of temperature control. However, neither of these combinations would teach the placement of the two chambers *within* an integral environment of high thermal conductivity.

In sum, the Court finds first that Quantachrome has failed to establish by clear and convincing evidence the suggestion to one of ordinary skill in the art to make the suggested combination. The Court further finds that a combination of the prior art including the Batchelor and Shea Patents and the Stereopycnometer does not suggest the placement of the sample and expansion chambers in an integral environment of high thermal conductivity.

Even considering the combination of all of the referenced prior art, the Court finds that at best such a combination may have suggested the desirability of experimenting with an integral environment of high thermal conductivity in order to eliminate the effects of internal and external heat flows.[12] However, the law is clear that it is not sufficient that the prior art render the claimed invention "obvious to try." *See In re Eli Lilly & Co.*, 902 F.2d 943, 945 (Fed.Cir.1990); *see also In re Gordon*, 733 F.2d 900, 902 (Fed.Cir.1984) ("The mere fact that the prior art could be so modified would not have made the modification obvious unless the prior art suggested the desirability of the modification.").

Therefore, for the foregoing reasons, the Court finds that none of the prior art references, alone or in combination, would have rendered Claim 27 of the '146 Patent obvious to one of ordinary skill in the art at the time of the invention.

## C. THE LEVEL OF ORDINARY SKILL IN THE ART AT THE TIME WHEN THE INVENTION WAS MADE

The third *Graham* factor is the level of ordinary skill in the art at the time the invention was made. The person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art. *See GPAC*, 57 F.3d at 1579. Such a person is not charged with knowledge of references not contained in the relevant prior art. *See In re Fine*, 837 F.2d 1071, 1075 (Fed.Cir.1988).

In determining the level of ordinary skill in the art, factors to consider include: type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field. *See Custom Accessories, Inc. v.*

---

12. Such a conclusion is evidenced by the testimony of Quantachrome's own witnesses to the effect that Gulf/Chevron and Quantachrome did indeed experiment with such a construction but then either abandoned or shelved the idea.

*Jeffrey–Allan Industries, Inc.,* 807 F.2d 955, 962 (Fed.Cir.1986).

The Court finds that the level of ordinary skill in the art was of a person holding at least a bachelor's degree, who had a basic understanding of thermodynamics, and who had a knowledge of the use of pycnometers and the mechanics of the process used by pycnometers to make measurements.[13] As previously discussed above, the Court finds that the placement of the sample and expansion chambers within an integral environment of high thermal conductivity would not have been obvious at the time of the '146 Patent to this hypothetical person of ordinary skill in the art.

## D. OBJECTIVE EVIDENCE OF NONOBVIOUSNESS

The fourth *Graham* factor is objective evidence of nonobviousness. Since the Court found at trial that Quantachrome failed during its case in chief to show by clear and convincing evidence that Claim 27 would have been obvious to one of ordinary skill in the art in light of the prior art itself, either alone or combined, the Court did not hear other objective evidence of nonobviousness. Such evidence of nonobviousness is not, of course, a requirement for a finding of nonobviousness and patentability. *See Custom Accessories,* 807 F.2d at 960.

Although the Court did hear some testimony touching on unsolved needs, failure of others, and the discovery of the solution to a known problem, the majority of testimony on these issues would have come during the presentation of Micromeritics' case. However, since the Court granted Micromeritics' Rule 52 motion at the close of Quantachrome's case in chief, Micromeritics never put on its case. Although Micromeritics asserted in its previous pleadings and its trial memorandum that it would put forward substantial objective evidence of nonobviousness, it was not necessary that Micromeritics do so. As such, for the Court to make any findings as to the objective evidence of nonobviousness would amount to conjecture.

Thus, since the Court found, and finds, that Quantachrome could not establish the obviousness of Claim 27 in light of the prior art itself, it is unnecessary for the Court to consider the fourth *Graham* element, other objective evidence of nonobviousness.

## V. CONCLUSION

It would be easy for one of ordinary skill in the art to look today at Claim 27 and the use of an integral environment of high thermal conductivity and say, "Of course! What had we been thinking? Nothing could be more obvious to eliminate the tiny heat flows that can affect accuracy than to place the two chambers side by side within an environment that is made of a highly thermally conductive material!" However, the relevant test is not what one of ordinary skill in the art might say today after seeing the '146 Patent. To the contrary, the relevant test is what would have been obvious to one of ordinary skill in the art at the time of the claimed invention.

For the reasons discussed in this Order, the Court finds that Quantachrome Corporation has not met the burden of proving by clear and convincing evidence that Claim 27 of the '146 Patent would have been obvious at the time of its invention to one of ordinary skill in the art. In accordance with this finding, the Court finds that Claim 27 of the '146 Patent is not obvious and is therefore valid.

Specifically, the Court agrees with the Patent Office in finding that the prior art did not show and would not have made obvious a pycnometer apparatus comprising a sample chamber and an expansion

---

**13.** Although Quantachrome's expert—a professor of thermodynamics—testified to what one of ordinary skill in the art would have known, the Court finds that one of ordinary skill in the art was one of significantly lesser knowledge than Professor Panagiotopoulos.

chamber connected by a passageway and positioned within an integral environment of high thermal conductivity.

Thus, having previously found that all claim limitations of Claim 27 are present in the accused device and finding that Claim 27 is not invalid as obvious under 35 U.S.C. § 103, the Court finds that Claim 27 of United States Patent No. 5,074,146, as confirmed by Reexamination Certificate B1 5,074,146, is valid and infringed.

The Court also finds that the present Order resolves all issues of liability in this matter and is a final judgment except for an accounting, and is consequently subject to appeal pursuant to 28 U.S.C. § 1292(c)(2).

Accordingly, the Court having heard the testimony and reviewed the evidence and the record in this case, and being otherwise duly advised, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Quantachrome's Motion to Reconsider Court's Claim 27 Orders, filed March 30, 2000, is **DENIED**;

2. **JUDGMENT** is hereby entered in favor of Micromeritics Instrument Corporation and against Quantachrome Corporation on the issue of liability for infringement by Quantachrome Corporation of Claim 27 of United States Patent No. 5,074,146, as confirmed by Reexamination Certificate B1 5,074,146;

3. Quantachrome, and its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Order, are hereby **PERMANENTLY ENJOINED** during the term of United States Patent B1 5,074,146, from infringing (directly, by contributory means, or by inducement) Claim 27 of said patent, including, without limitation, the manufacture, distribution, use, sale, offering for sale, importing into the United States, or supply of components for assembly abroad, of the Quantachrome Ultrapycnometer 1000 as pictured in Exhibit A to this Court's Order of February 17, 1999, and as elaborated on in this Court's Order of May 4, 1999, or any colorable variation thereof.

4. It is **FURTHER ORDERED** that proceedings in the case are **STAYED** and **ABATED** for ten (10) days from the date of this Order. During that time, should Quantachrome Corporation enter a Notice of Appeal, this case shall automatically be stayed pending final action by the United States Court of Appeals for the Federal Circuit. Should Quantachrome not enter a Notice of Appeal during this time, discovery on the remaining issues shall resume, and the Court will set relevant deadlines and hearing dates by future order.