**Herbert L. MARKMAN, Plaintiff,**

v.

**Bruce A. LEHMAN, Assistant Secretary and Commissioner of Patents and Trademark, Defendant.**

No. CIV.A. 96–2635 (JR).

United States District Court, District of Columbia.

Dec. 3, 1997.

Ross A. Keene, Eckert, Seamans, Cherin & Mellott, Washington, DC, William B. Mallin, Timothy P. Ryan, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, for Plaintiff.

Albin F. Drost, Craig R. Kaufman, Kevin T. Kramer, Nancy J. Linck, John M. Whealan, Office of the Solicitor, Arlington, VA, for Defendant.

## *MEMORANDUM*

ROBERTSON, District Judge.

This is an action for review under 35 U.S.C. § 145 of a Patent and Trademark Office ("PTO") Board of Patent Appeals and Interferences ("Board") decision rejecting all fifteen claims in United States Patent No. Re.33,054 ("the '054 patent") for obviousness under 35 U.S.C. § 103. The '054 patent was before the PTO on reexamination pursuant to 35 U.S.C. §§ 301–07. The relief plaintiff seeks is an order compelling the PTO to issue a reexamination certificate. This memorandum sets forth the Court's findings of facts and conclusions of law after a bench trial held August 11–13, 1997.

### BACKGROUND

The '054 patent covers an inventory control and reporting system in which bar codes are printed in coincidence with transactions having associated articles. Exh. 1. The patent discloses a preferred embodiment in which bar codes are printed in coincidence with dry-cleaning transactions in which the associated articles are garments to be cleaned. *Id.*

The '054 patent originated with patent application 06/599,948 (the '948 application), filed with the PTO on April 13, 1984 by plaintiff Herbert L. Markman, who is the named inventor. On October 29, 1985, the PTO issued the application as United States Patent No. 4,550,246 ("the '246 patent"), having 13 claims covering an inventory control and reporting system. Stip. Facts ¶¶ 5–6. On August 28, 1987, Markman filed an application for the reissue of the '246 patent, adding two new claims. *Id.* ¶ 7–8. On September 12, 1989, the PTO reissued the '246 patent as the '054 patent, having 15 claims. *Id.* ¶ 9.

On August 26, 1993, a competitor of Markman filed a request for reexamination of the '054 patent. *Id.* ¶ 10. A PTO examiner granted the reexamination request and rejected claims 1–15 pursuant to 35 U.S.C. § 103 for obviousness. The Board affirmed the examiner's rejection on September 25, 1996. Plaintiff filed the present suit on November 21, 1996.

### STANDARD OF REVIEW

■ "Reexamination" pursuant to 35 U.S.C. §§ 301–07 is a procedure by which the Commissioner may resolve a substantial new question of patentability affecting any claim of a patent. *See* 35 U.S.C. § 303. *Cf. In re Recreative Technologies Corp.*, 83 F.3d 1394, 1398 (Fed.Cir.1996) (no reexamination for questions of patentability decided in the original examination). A patent undergoing reexamination has no presumption of validity. *In re Etter*, 756 F.2d 852, 857 (Fed.Cir.) (in banc), *cert. denied*, 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985).

■ The PTO can reject claims during reexamination when the rejection is supported by a combination of prior art previously before the PTO and prior art previously not before the PTO, but not if it is supported only by prior art previously considered by the PTO in relation to the same or broader claims. *Etter*, 756 F.2d at 855. *In re Portola Packaging, Inc.*, 110 F.3d 786, 791 (Fed.Cir.1997). In this case, prior art was brought to the PTO's attention that had not been previously considered by the PTO and reexamination was granted because this art raised a substantial new question of patentability.

■ In a proceeding under 35 U.S.C. § 145 the Court may find that the applicant is entitled to a patent "as the facts in the case may appear." *Id.* Basically,

[t]he thrust of [a § 145] complaint is that the decision of the board is erroneous on the facts, the law, or both. Indeed, the board's decision is the jurisdictional base for the suit and the record before the office is the evidentiary nucleus. The proceed-

ing, however, is not simply an appeal since the parties are entitled to submit additional evidence. Thus, an action under § 145 is conducted as a trial; however, it is in essence a suit to set aside the final decision of the board . . . .

*Fregeau v. Mossinghoff,* 776 F.2d 1034, 1036–37 (Fed.Cir.1985). In light of the hybrid nature of a § 145 proceeding, which has aspects of both a trial and an appeal, the appropriate standard of review is as follows:

> [I]n the absence of additional evidence affecting a particular finding, a finding of fact by the board may be set aside by the district court if clearly erroneous. . . . [W]here new evidence is presented to the district court on a disputed fact question, a de novo finding will be necessary to take such evidence into account together with the evidence before the board.

*Id.* at 1038. In the present case, the parties presented additional evidence on nearly every issue.

## THE OBVIOUSNESS DETERMINATION

 A patent may not be granted if

the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103. While the ultimate question of patent validity is one of law, the obviousness determination is based on fact. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). Determining whether the claimed invention would have been obvious to a person of ordinary skill requires the finder of fact (a) to review the scope and content of the prior art, (b) to ascertain the level of ordinary skill in the art, and (c) to identify the differences between the prior art and the claimed invention. *Id.* Factors such as commercial success and long-felt but unresolved need are secondary but also relevant to the obviousness determination. *Id.*

### A. Scope of the Prior Art

 The prior art relevant to an obviousness determination includes references within the inventor's particular field of endeavor and any "analogous art." *In re GPAC Inc.,* 57 F.3d 1573, 1577–78 (Fed.Cir.1995). A reference is "analogous art" when a person of ordinary skill would reasonably have consulted it and applied its teachings in seeking a solution to the problem that the inventor was attempting to solve. *Id.* at 1578.

The references relied upon by the Board as evidence of obviousness in this case include: (1) William Noel & Donald Marsey, *Textiles: How Bar Codes Advance an Old Technology,* Bar Code News, Nov./Dec.1982, at 20–23 ("Noel") (Exh. 11); (2) Robert Krause & Nathan Walker, *Solve Data–Entry Productivity Problems with Bar Codes,* 29 Electronic Design 208 (1981) ("Krause") (Exh. 12); (3) Brochures and two letters describing the Liberty Lister Computerized Listing/Pricing Machine for Drycleaners and Laundries (1982) ("Liberty Lister") (Exh. 13); (4) Brochures describing the Countmaster Mark–In Cash and Dry-cleaning Control System (1983) ("Countmaster") (Exh. 14); and (5) Advertisements describing the Thermopatch ThermoLogic Label Printer (1981–82) ("Thermopatch") (Exh. 15). The PTO did not consider Noel, Krause, Marathon, Stanley, or Stein during the original examination of the '948 patent application or the reissue proceeding for the '246 patent. Additional references offered by the Commissioner at trial as evidence of obviousness were: (6) *Running Bars: Bar Code and the New York Marathon,* Bar Code News, Mar./Apr. 1983, at 26–28 ("Marathon") (Exh. 16); (7) Robert Stanley, *Help Needed at Central Supply, STAT: Bar Codes Ease Growing Pains,* Bar Code News, Mar./Apr.1983, at 2–4 ("Starley") (Exh. 17); and (8) Kenneth J. Stein, *Eastern Installs Baggage Code System,* Aviation Week & Space Technology, Feb. 26, 1973, at 27–28 ("Stein") (Exh. 18).

The Court finds that all of the above-cited references are relevant prior art.

#### 1. *Each reference is relevant*

The '054 specification states that the field of the invention broadly is "inventory control devices capable of monitoring and reporting

upon the status, location and throughput of inventory in an establishment." Exh. 1, col. 1, 11. 11–15. More specifically, the invention relates to an inventory control system "especially adapted to the peculiar needs of dry-cleaning establishments." *Id.* 11. 15–17. The description of the prior art in the specification mentions inventory control systems adapted for dry-cleaning stores as well as systems for general warehouse distribution. *See id.* cols. 1–3. The patent identifies problems confronting the inventor such as the need for increased security and reduced cost. *Id.* col. 3.

Noel shows an inventory control and reporting system using bar codes to identify and track rolls of denim. *See* Exh. 11. Krause teaches inventory control and reporting systems using bar codes. *See* Exh. 12. Liberty Lister shows a listing and pricing system for drycleaners and laundries using bar codes. *See* Exh. 13. Countmaster shows a dry-cleaning tagging and receipt system having reduced cost and increased security. *See* Exh. 14. Thermopatch shows a labeling system for drycleaners and laundries. *See* Exh. 15. Marathon shows the identification and tracking of runners in a race using bar codes for increased security. *See* Exh. 16. Stanley shows the identification of hospital patients and nurses' station inventories using bar codes. *See* Exh. 17. Stein shows a baggage inventory system using bar codes. *See* Exh. 18. Each of these references relates either to the field of inventory control or to the problems confronting the inventor.

### 2. *Each reference is prior art*

■ In *ex parte* patent prosecution, a patent examiner may refer to a document published within one year before the application as "prior art" under 35 U.S.C. § 102(a) and § 103 unless the inventor comes forward with evidence showing an earlier date of invention. *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1576 (Fed.Cir.1996). A party attempting to show that such a reference is not prior art or to "swear behind" the reference, must offer evidence showing he or she invented the subject matter of the claimed invention before the publication date of the asserted prior art reference. *Id.* at 1576–77.

A document that was published *more than one year before* the application date cannot be "sworn behind." *In re Eickmeyer,* 602 F.2d 974, 978 n. 8 (CCPA 1979).

■ To eliminate a reference by showing prior invention, the patent applicant can show that he or she reduced the invention to practice prior to the publication date of the reference. *Mahurkar,* 79 F.3d at 1578. Proof of actual reduction to practice requires a showing that the apparatus actually existed and that it worked for its intended purpose. *In re Asahi/America, Inc.,* 68 F.3d 442, 445 (Fed.Cir.1995); *Mahurkar,* 79 F.3d at 1578. To establish an actual reduction to practice, an inventor must provide independent corroborating evidence in addition to his or her own statements and documents, such as testimony of a witness other than the inventor or evidence of surrounding facts and circumstances independent of information received from the inventor. The purpose of this rule is to prevent fraud. *Hahn v. Wong,* 892 F.2d 1028 (Fed.Cir.1989)

■ There is only one dispute as to whether the references discussed above are prior art: Plaintiff contends that he reduced his claimed invention to practice before the publication date of the Countmaster's reference and asserts that that reference cannot serve as evidence of obviousness under § 103.

Plaintiff did not attempt to swear behind the Countmaster reference by filing a 37 C.F.R. § 1.131 affidavit during the reexamination proceeding. He explained at trial that he had no basis to believe he could swear behind the reference until he had deposed his witnesses for trial. That assertion was undisputed. The Court accordingly received plaintiff's evidence.

Plaintiff testified that the Countmaster reference was first available at an industry trade show—the "Clean 83" show—held July 25–28, 1983. Tr. Trans. at 234–35; *see* Exh. 184. Plaintiff further testified that he had reduced his claimed invention to practice by early July 1983, Tr. Trans. at 57, two to three weeks earlier than the Countmaster reference, *id.* at 250.

On cross-examination, plaintiff stated that he had no evidence corroborating his claim of reduction to practice in July 1983. Tr. Trans. at 183–84; *see also* Tr. Trans. at 231. On redirect the next morning, however, the following colloquy took place:

Q. Mr. Markman, yesterday I believe Mr. Whealan posed a question about—concerning the data [sic: date?] reduction to practice of your invention; do you recall that?

A. Yes, I do.

Q. He asked you, sir, if you had any I believe what he described as corroborative evidence. Do you recall him asking that question?

A. Yes.

Q. What was your answer to that question?

A. I didn't have any corroborating evidence here.

Q. And, sir, did you have an opportunity over the last evening, over the break last evening, to look through your papers to see if you could find any evidence that would satisfy Mr. Whealan's question?

A. Yes.

Q. And were you about [sic: able?] to find any, sir?

A. Yes, I was.

Tr. Trans. at 231–32. Plaintiff then produced a purported dry-cleaning ticket. The top portion of the ticket bears a bar code, two alpha-numeric numbers, and the date July 19, 1983. Exh. 187. He testified that the bar code and alpha-numeric numbers were printed by the first commercial embodiment of his invention. Tr. Trans. at 328–29. Plaintiff also produced a photograph, Exhibit 188, purporting to be a photograph of his trade booth at the Clean 83 trade show. Plaintiff testified that the dry-cleaning ticket, Exhibit 187, appears in the photograph and was exhibited at the trade show. Tr. Trans. at 233; Exh. 188.

On re-cross examination, however, plaintiff conceded that in 1991, when he was shown the same dry-cleaning ticket at a deposition, he was unable to recall whether the ticket had been produced by a cut-and-paste method or by a computerized system. Tr. Trans. at 323–24. He said:

The bar code [and the two alpha-numeric numbers] were printed by an NCR printer under the control of the data processor. It was the first commercial embodiment of the invention.

The problems that I had with it, it took like 45 seconds to produce that bar code, and the quality of the bar code was very poor, and it was very difficult to wand in.

So this—those three items on this ticket were created prior to 7/19/83. I'm not sure how much prior. The deposition that says cut-and-paste is—I could not verify during my deposition that the rest of this ticket was created by the same printer, but the—those three items on the ticket were created by the commercial embodiment on an NCR printer in the commercial—not the commercial—on the—on the first working model of the invention, which was not commercially salable at that point.

Tr. Trans. at 329.

The persuasiveness of plaintiff's corroborating evidence was seriously undercut by the timing of its presentation: plaintiff had given notice before trial that he would attempt to swear behind the Countmaster reference, then said he had no corroborating evidence, and then—after his cross-examination—suddenly produced the ticket and photograph. Even if plaintiff's testimony was true, it established only that he had a printer that could print a bar code on demand. It did not establish that plaintiff had reduced his invention to practice, including all the elements of that invention as claimed. Plaintiff admitted that the system he showed at Clean '83 was not the claimed invention because it did not print bar codes in coincidence with transactions. Tr. Trans. at 325. The brochure he distributed at the Clean '83 show described the bar codes as "pre-printed." *Id.* at 326. It would make little sense to display a ticket at his trade booth that had not been produced by the same system shown at that trade show. Plaintiff's testimony did not address this discrepancy.

The evidence as a whole does not persuade the Court that plaintiff indeed reduced his invention to practice in early July 1993. Countmaster, accordingly, is prior art.

## B. Contents of the Prior Art

■ The prior art is relevant for all it contains, including what it fairly suggests to one of ordinary skill in the art. *In re Fracalossi*, 681 F.2d 792, 794 n. 1 (CCPA 1982); *In re Young*, 927 F.2d 588, 591 (Fed.Cir. 1991) (test for obviousness is what the combined teachings of the references would have suggested to one of ordinary skill in the art).

### 1. *Noel*

Noel describes a computerized label preparation and inventory control system for tracking rolls of denim that are entered into inventory after manufacture. Exh. 11 at 20–23. Noel's system is also used for selecting rolls of denim from inventory for shipment to customers. *Id.* at 21. Noel teaches that information regarding successive rolls of denim can be encoded using a keyboard. *Id.* at 20. Noel discloses that, after information is entered into the computer regarding the identity and description of a roll of denim, a unique label is then printed that includes "the bar code equivalent of the package's identification number" and alphanumeric information. *Id.* at 20. Noel states that "[l]abels are now printed on-site." *Id.* at 23. Noel expressly shows a printer generating unique labels with sequential numbers and unique bar codes. *Id.* at 21. Noel states that the system "allows multiple copies of each pressure-sensitive label to be made at one time, so they are easily attached to rolls and verified by the scanner on the shipping floor." *Id.* at 21–22. Noel explains the use of a scanner to "record package number and storage location for each roll." *Id.* at 20–21. Noel explains that the factory uses "Norand portable scanning equipment to record package number and storage location for each roll." *Id.* at 20–21. Noel explains that his system will "ensure that customers get the material they ordered." *Id.* at 23. Noel also states that the "system will pay for itself rapidly by ... eliminating errors ... and improv[ing] inventory control." *Id.* at 23.

### 2. *Krause*

Krause teaches that using bar code systems in factory environments increases accuracy and speed. Exh. 12 at 207. Krause further teaches that bar codes can be used "anywhere a pencil and paper is used," including

> remote data collection, ticket identification systems, security checkpoint verification, file folder tracking, inventory control, identifying assemblies in service, repair/manufacturing environments, functional programming, and software distribution ... administrative and work floor functions in the retail environment, such as payments, purchase order entry, personnel and payroll records, receipts, adjustments, returns, transfers, and credit card applications. ... Industrial managers use them to control manufacturing processes, to track the flow of materials and products, to measure production, and to monitor inventory, shipping, invoicing, etc.

*Id.* at 212. Krause explains that the typical bar code system has a scanner, a digital processor interface, and a bar code generator. *Id.* at 208.

Krause describes an "important bar code application example [that] involves the handling of PC board rework." *Id.* at 212. "When a computer system fails, the customer engineer isolates, replaces, and then sends faulty PC boards back to the factory for processing." *Id.* at 213–14. Krause states that PC "boards received from the customer engineer are first logged into the system using a manually operated terminal. Unique information about the board, such as part number, date code, etc. is entered. And a bar symbol encoding a control number is stamped on a tag which accompanies the PC board through the repair cycle." *Id.* at 214. Krause shows a picture of the bar-coded tag attached to the PC board. *Id.* at 216. Krause explains that "a specific bar-code may be required to be available on demand at the user's facility ('demand printing')." *Id.* at 208. Krause contrasts "demand printing" with "source printing" where a "predetermined sequence of tags can be generated outside." *Id.* Krause also depicts a bar code printer generating bar coded tags to be placed on a PC board. *Id.* Krause also explains that scanners are used at different locations in the factory to track the progress of printed circuit boards. *Id.* at 214.

### 3. *Liberty Lister*

Liberty Lister discloses a listing and pricing machine for drycleaners and laundries that uses bar codes. Exh. 13 at 301. Liberty Lister uses an invoice ticket printer, microprocessor, and bar code wand. Liberty Lister operates with a bar code selection menu that provides for dry-cleaning items to be identified by "type, color, quantity and other descriptions." *Id.* An operator enters items with the wand from the bar code menu. The "invoice number, preprinted in bar-code form, also is entered electronically with the wand—saving a great deal of time while ensuring against human error." *Id.* A keyboard can be used instead of the bar code menu. *Id.* at 303. An invoice is printed with descriptions of the various dry-cleaning items and prices, including appropriate up charges, tax, number of pieces in the order, date, time, and identifying numbers. *Id.* at 301.

The teachings of Liberty Lister relate *inter alia* to security aspects of monitoring dry-cleaning transactions. For example, Liberty Lister teaches that "all pricing judgments are made by management, not clerks." *Id.* at 302. Liberty Lister teaches that dishonest clerks can be exposed by accounting for missing invoice numbers. *Id.* at 311. Liberty Lister provides detailed printouts including "piece count by item, dollar sales and invoice count by service, missing ticket numbers, starting and ending numbers of invoices used during the period." *Id.* at 301. Liberty Lister's activity reports "are available only to the owner or his designated representative, using an identification code." *Id.* at 301.

### 4. *Countmaster*

Countmaster discloses a garment inventory system for dry-cleaning. Exh. 14 at 1135. Countmaster teaches generating "a store receipt, customer claim check . . . even all garment tags . . . with the press of a button." *Id.* at 1137. These items are generated by a printer in coincidence with a dry-cleaning transaction to give security against "freebies" or cash control problems. *Id.* at 1135. Countmaster expressly states: "Bar code reading and slip printer available." *Id.* at 1137. Countmaster explicitly shows "garment tickets" for direct attachment to dry-cleaning articles separately describing a coat, sweater, skirt, and tie. The "garment tickets" include sequential numbers to identify each garment. *Id.* at 1137.

### 5. *Thermopatch*

Thermopatch describes a "label printer system" that prints bar coded labels that remain "sharp, clear and scannable" through laundering and dry-cleaning. Exh. 15 at 130. Thermopatch shows a bar-coded label for use in inventory control. *Id.* at 132. Thermopatch states that "this type label speeds inventory. The interleaved 2 of 5 bar code with up to 9 digits is easily scanned for accurate inventory count." *Id.* Thermopatch teaches that labels are printed automatically. For example, Thermopatch states: "Keyboard it once and print as many identical labels as you want just by pressing a command key. You can even change any portion without changing the entire label." *Id.* at 130.

### 6. *Marathon*

Marathon discloses a system which prints bar-coded registration cards for runners as they enter the New York City Marathon. Marathon states:

> The system produces a bar-coded registration card (Fig.1) for each entrant, which includes name, marathon number, best previous time, and fee-payment information. The code used on the card is Code 128. The coded registration card serves two purposes: it ensures that the runner gets the correct number on arrival in New York, and also acts as a security device, so that only the person assigned the number can receive his or her running number.

Exh. 16 at 26. Marathon teaches that the New York City Road Runners Club "has used bar codes to simplify its marathon operations since 1979." *Id.* Marathon shows "alpha-numeric indicia" such as words, letters, and numbers on a bar-coded label. For example, Marathon shows the bar-coded registration card with the name of the runner entered in the marathon and the runner's number. *Id.* Marathon teaches printing bar codes in coincidence with an exchange of articles. Marathon teaches printing bar-coded registration cards after the receipt of

"entry forms." The registration cards are then sent to race entrants. *Id.* Entry forms are exchanged for race registration cards.

### 7. *Stanley*

Stanley describes a hospital procurement and distribution system using bar codes. Stanley indicates that the system "is based on two bar-coded labels—one for patient identification, with the bar code representing the patient account number; the other containing the [supply, procurement, and distribution ("SPD")] item information." Exh. 17 at 2. Stanley states that "[i]dentification labels for the SPD items are printed out as required." *Id.* at 3. Stanley also states that the "patient ID labels (Photo 2) are generated when information is entered into our mainframe computer at the time of admission." *Id.* at 3. Stanley shows a printer generating bar-coded labels and states that "[a]s each patient is admitted, a set of pressure sensitive labels is prepared and sent up to the appropriate nursing station." *Id.*

### 8. *Stein*

Stein describes the baggage handling system used by Eastern Airlines at the Miami International Airport beginning in 1974. Stein explains that Eastern "utilizes specially coded labels printed on demand at baggage check-in points." Exh. 18 at 27. Stein explains that "[l]abels are printed in response to operator entry of flight and destination information by means of a keyboard atop the [printer]. When the operator depresses a 'print' bar, the [printer] produces a coded label within 5 sec. Using the same data, it produces a conventional [serially numbered] baggage handle strip label within 2 sec." *Id.* Multiple copies of the same labels may be produced from the same data. *Id.* Stein teaches printing bar codes in coincidence with an exchange of goods. For example, Stein explains that bull's-eye codes are "printed in response to operator entry of flight and destination information" after passenger luggage is presented for check-in. *Id.* In exchange for the luggage, Stein explains that a "tear-off stub is presented to the passenger as a regular baggage claim check." *Id.* The luggage is then placed on a conveyor and routed to the correct flight and destination.

### 9. *Other Prior Art*

In the patent specification, plaintiff described what he admitted to be the state of the art at the time of his invention. Plaintiff described that "inventory control in connection with a laundry or retail establishment is assisted by use of automatically-scannable tags attached to articles of clothing. The tags are scanned upon delivery of articles, whereupon the inventory count is adjusted . . . . [The prior art teaches] the usefulness of automation in laundry systems to assist in detecting dishonest clerks." Exh. 1, col. 1, ll. 66–68, col. 2, ll. 1–4. In connection with inventory control systems, plaintiff stated that "a number of printing and optical detection systems have been developed." *Id.* at col. 2, ll. 29–30. Also, the "least error prone and fastest automatic scanners rely upon codes generated from a coded sequence of parallel bars ('bar codes')." *Id.* at col. 2, ll. 35–38. Furthermore, the "use of written indicia bearing an automatically-scannable bar code has been known in the art, and in connection with laundries." *Id.* at col. 2, ll. 62–64. Plaintiff also admitted that data input devices, data processors, printers, bar codes, and bar code scanners were known in the prior art. Exh. 1 at cols 1–3. 7, 10.

Printers that printed bar codes at the location of the end user of the bar codes were known in the art at the time of the invention. For example, Markman's Automated Soil Count System installed at Jolicoeur printed bar-coded labels on-site. Tr. Trans. at 48.

The Zebra Printer was advertised in *Bar Code News* in September/October 1982. Exh. 22. According to the advertisement, the Zebra Printer "is a compact, high speed, bidirectional dot-matrix printer that prints and dispenses most labels in one to three seconds." Using the Zebra printer, the user could "switch formats anytime—from bar code product IDs to alpha-numerics." The Zebra Printer was "designed to print individualized labels . . . one label at a time with the backing removed, or more labels in a strip that may be torn off, as well as individual tags and tickets of various thicknesses." The advertisement indicates that the "Zebra

Printer is perfect for applications such as inventory control, supermarket shelf labels, document and material tracking, airline tickets, retail tags, etc." *Id.*

Intermec Serial Impact Printers were available as early as 1977. Exh. 32. Such printers were "designed for random input short runs of labels or tags with very high print quality" and printed "virtually any common bar-code format." *Id.* The printers were advertised for "random-weight UPC symbols ... used in *supermarkets* to encode the price and product identification number of labels for individual cuts of fresh meat which have been weighed and wrapped in the store." *Id.* (emphasis in original). Intermec explained that the "*in-store*-printed UPC symbols on these random-weight items are subsequently read at the point of sale by a laser scanner which also reads *source*-printed symbols on prepackaged grocery items." *Id.* (emphasis in original).

Matthews Bar Code Printing Systems were available as early as September 1982. Ex. 33 at 23. Matthews printers were used for "on-line bar code printing applications" and could "print bar codes and other information directly on products and packages." *Id.* Matthews printers also printed "bar codes and other data on self-adhesive labels." *Id.*

Scanmark bar code printers were available as early as September 1982. Exh. 33 at 7. Scanmark advertised its printers as follows: "Whatever you want to bar code—whether it's a mousetrap, circuit boards with tiny polyester labels or shipping cartons with large, bi-directional codes, or even washable cloth labels—there is a Scanmark printer and label material for almost any job." *Id.* Scanmark advertised that its printers and label materials were "designed from scratch to print bar codes" which resulted in the "highest quality bar code labels possible" and "reliability." *Id.*

Weber Legitronic bar code printers were available at least as early as March 1983. Exh. 34 at 15. Weber Legitronic printers had "built-in flexibility to adapt to any bar coding system." *Id.* Weber Legitronic printers could "make labels for production/process control, product identification, shipment ad-

dressing, and more." *Id.* Weber Legitronic printers could "remember bar codes and label formats, do consecutive numbering and create clean, crisp characters in sizes ranging from 0.1 inch to 9.9 inches." *Id.*

C. Itoh dot matrix printers were available as early as March 1983. Exh. 34 at 25. C. Itoh advertised that its printers "bring bit-addressable graphics and high resolution to Bar Codes." *Id.* C. Itoh advertised that its printers were "designed for highest duty-cycle use, making them ideal for all demanding environments, even warehouse and industrial locations." *Id.* C. Itoh also advertised that its printers were "designed to fit right into every office environment. They offer a small footprint, a low profile, and a true office environment noise level." *Id.*

Printronix bar code printers were available as early as 1981. Exh. 35 at 4. Printronix printers were advertised as a "cost-effective solution for label-making" and "capable of producing both crisp, high resolution bar codes and consistent superior printing for OCR characters." *Id.* Printronix printers were advertised as acceptable for "retail, wholesale, distribution, service or manufacturing" and for "better inventory control." *Id.*

Scanners which could read bar codes were also known in the art at the time of the invention. As early as September 1982, Scanstar bar code scanners were advertised as "available to read any of the popular bar code symbols, including Code 128. The codes may be generated via dot matrix, impact electrostatic, ink jet, Lasertech, and conventional printing techniques." Exh. 23. As early as March 1983, Symbol Technologies LX–7000 scanners were advertised as having full "decode support for all the common bar code symbologies." Exh. 34 at 32. As early as March 1983, Welch Allyn scanners were advertised as having the ability to "handle all popular bar codes including CODABAR, 3 of 9, Interleaved 2 of 5, 5 bar 2 of 5, UPC, EAN and MSI/PLESSY." *Id.* at 7. Welch Allyn scanners were also advertised as easily "integrated into your existing system." *Id.* Hewlett Packard "announced a handheld scanner designed to read high-density bar

codes" as early as September 1982. Exh. 33 at 26. Hewlett Packard indicated that its scanner was designed for bar codes with "narrow bar width." *Id.* Skan–a–Matic Corporation advertised its DS Series Mini Bar Code Reader as early as September 1982. Exh. 33 at 30. Skan–a–Matic indicated that its D2 Series featured a "hand-held code pen for on-site reading of Interleaved 2 of 5, Code 3 of 9, and Codabar code formats. It automatically identifies the code scanned, decodes it, and transmits the data to your computer." *Id.*

Software for generating bar codes was also known in the art and available for sale at the time of the invention. For example, Dataflow Technologies, Incorporated advertised a "package of callable subroutine modules which print bar code symbols with OCR–A interpretation, using the Okidata Microline 84 200 cps dot matrix printer." Exh. 34 at 31. Dataflow advertised that the "modules can generate Code 39, Code 93, 2 of 5, UPC and Codabar" and that "[v]ersions of the package may be used on the IBM PC, the Columbia Data Products' MPC, or any CPM- or MPM-based microcomputer." *Id.*

At the time of the invention, bar codes were used in connection with many different types of applications in many different industries. For example, HP taught that bar codes may be used for: item location for items in raw stores, work-in-process, finished goods, or a distribution facility; employee identification for time and attendance recording, productivity measurement, equipment check-out, or task accountability; assembly steps or process steps for monitoring the status of items in manufacturing or repair environments; and failure mode for items which fail during reliability testing or in the field. Exh. 36 at 2. In addition, Bruce R. Wray, *Bar Code Reality: Increasing Productivity*, Bar Code News, Jan./Feb.1983, at 17–21 ("Wray") taught that bar codes were used in supermarkets, the automotive industry, blood banks, libraries, magazines and paperback books, medical histories and patient tests, the military, package routing, photo finishing, ski lifts, stockroom control, warehousing, and mail handling. Exh. 38 at 19–20.

## C. Level of Ordinary Skill in the Art at the Time of the Invention

A "person of ordinary skill in the art" is a "hypothetical person who is presumed to know the relevant prior art." *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed.Cir. 1995). The level of skill in the art is measured as of the time the invention was made. *In re Epstein*, 32 F.3d 1559, 1564 n. 4 (Fed. Cir.1994). In determining the skill level, the court may consider various factors including "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *GPAC*, 57 F.3d at 1579 (citation omitted). "In a given case, every factor may not be present, and one or more factors may dominate." *Id.* In some cases, the level of ordinary skill can best be determined by reference to the prior art. *See id.*

Duane Dunlap, plaintiff's expert witness in the area of bar code, automatic data capture, and inventory control, described a person of ordinary skill in the art in 1983–84:

Somebody, quite simply, who has an understanding of database structures, microprocessors, of the use in a computerized inventory control system, also an understanding and recognizing the input devices that are state-of-the-art with bar codes and associated symbologies, and printing technologies that could be used, as well as a part of the system.

Tr. Trans. at 263. Defendant offered the expert testimony of Benjamin Nelson on the subject of bar code printing and technology. Mr. Nelson said:

I think at the time of the invention, the people with an ordinary level of skill knew a little bit more about more things and about doing them themselves than they do today. Today there are systems houses you can go to, there are organizations you can call. Many companies now sell complete systems.

Back in the—at the time of the invention, this was not true. People were a bit more self-sufficient, and I think that the level of skill was different.

To give you an example, I recall at a number of trade shows in the early days where, if I wanted to go to lunch, I could go to one of my competitors and they could come into my booth and run my booth for me while I was gone, because they knew my product as well as I knew theirs. This doesn't occur anymore.

So I think that the level of skill was a bit different back then. It was more rounded then than it is now. Now people are very, very skilled in computers, very, very skilled in scanners. But at the time of the invention, people were skilled in all the components.

Tr. Trans. at 397–98.

The prior art itself also demonstrates the knowledge possessed by one of ordinary skill at the time of the invention. For example, Krause shows that it was known that "barcode system hardware consists of the scanner, the digital processor interface, and the bar-code generator." Exh. 12 at 140. Krause provides a diagram which shows how a system operates and explains that the "digital-processor interface consists of the bar-code decoder and a communications-protocol interface to the main computer system." *Id. Elements of a Bar Code System*, Hewlett Packard, Application Note 1013, Nov. 1982 ("HP") shows the considerations for designing a bar code system. HP discusses the "principle criteria for selecting a code and the supporting equipment ... along with a discussion of the interaction of the system elements." Exh. 36 at 1. HP taught how data is stored and retrieved, bar code symbology, symbol generation, and data entry. *Id.* at 1–23.

The testimony of the opinion witnesses and the state of the art at the time of the invention establish finds that one of ordinary skill in the art would have known of the prior art discussed above. One of ordinary skill also would have known how to put together the basic components of a bar code system at the time of the invention. One of ordinary skill would have appreciated the advantages of

such a system in inventory and reporting applications.

## D. Differences between the Prior Art and the Claims

Plaintiff asserts that the claim limitation which distinguishes his inventory control and reporting system over the prior art is the printing of bar codes only in coincidence with transactions having articles. Claim 1 [1] reads:

1. The inventory control and reporting system, comprising;

a data input device for manual operation by an attendant, the input device having switch means operable to encode information relating to sequential transactions, each of the transactions having articles associated therewith, said information including transaction identity and descriptions of each of said articles associated with the transactions;

a data processor including memory operable to record said information and means to maintain an inventory total, said data processor having means to associate sequential transactions with unique sequential indicia and to generate at least one report of said total and said transactions, the unique sequential indicia and the descriptions of articles in the sequential transactions being reconcilable against one another;

a dot matrix printer operable under control of the data processor to generate a written record of the indicia associated with sequential transactions, the written record including optically-detectable bar codes having a series of contrasting spaced bands, *the bar codes being printed only in coincidence with each said transaction* and at least part of the written record bearing a portion to be attached to said articles; and

at least one optical scanner connected to the data processor and operable to detect

1. The '054 patent contains 15 claims. Claims 1 and 14 are independent claims. Claims 2–13 are dependent upon claim 1; claim 15 is dependent upon claim 14. All claims are drawn to an inventory control and reporting system using bar codes. Independent claims 1 and 14 are not limited to any environment. Dependent claims 7, 11, 12, 13, and 15 are limited to retail drycleaning establishments, the environment of the preferred embodiment.

said bar codes on all articles passing a predetermined station,

whereby said system can detect and localize spurious additions to inventory as well as spurious deletions therefrom.

Exh. 1, cols. 10–11 (emphasis added).

The parties dispute the meaning of the underscored phrase. According to plaintiff, the claims require that a bar code be printed in sequence with an exchange or transfer of custody of articles, as between two parties. The Commissioner asserts that the claims do not require such an exchange or transfer. Rather, the Commissioner maintains, and the Board held, that the claims merely require the printing of bar codes when an item to be inventoried is uniquely identified and entered into the inventory control and reporting system. The parties' differing interpretations are significant in that plaintiff, based on his interpretation of the claims, argues that prior art relating to inventory and control systems in a factory or warehouse environment cannot evidence the obviousness of his invention.

### 1. Claim interpretation

▮▮▮▮ The first task in evaluating the differences between the prior art and the claimed invention is to interpret the patent claims. *See Beachcombers, Int'l v. Wildewood Creative Prods., Inc.*, 31 F.3d 1154, 1160 (Fed.Cir.1994). In a reexamination proceeding, claims are given their broadest reasonable interpretation consistent with the patent specification and file history. *See In re Graves*, 69 F.3d 1147, 1152 (Fed.Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1362, 134 L.Ed.2d 528 (1996). Words in a claim are given their ordinary and accustomed meaning unless it appears from the specification and file history that the inventor intended they have a different interpretation. *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1577 (Fed.Cir.1993). Limitations appearing in the specification, but not in the claims, generally should not be read into the claims. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed.Cir.1994); *E.I. du Pont de*

*Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir.), *cert. denied*, 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). Rather, it is the language of the claims, not the written description, that defines the scope of the invention. *In re Morris*, 1997 WL 467688, *5 (Fed.Cir. Aug.18, 1997) (citing *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed.Cir.1997)).

▮▮▮▮ Claim 1 is drawn to an "inventory control and reporting system" and is not limited to the dry-cleaning environment that is disclosed as the preferred embodiment. The claims recite "bar codes being printed only in coincidence with each ... transaction," but do not recite an "exchange" or "transfer" of articles, as between two parties. In common usage, the term "transaction" can mean (1) the carrying out or performance of something, or (2) the exchange of something.[2] The first is the broader of the two, and it must be accepted unless the specification and file history show that the inventor intended the more narrow one.

The '054 specification describes the preferred embodiment of a dry-cleaning inventory system, wherein customers drop off clothing articles to be dry-cleaned and retrieved at a later time. In its use of the term "transaction," however, the specification does not limit it to an "exchange" or "transfer" of articles, as between two parties.

It states for example: "Every transaction is recorded, including identification of the articles placed into inventory," Exh. 1 at col. 5, ll. 8–10. During the initial examination of the patent application, plaintiff stated that the claims related to "general purpose inventory control or general purpose totalizing," Exh. 59, Amendment dated Mar. 8, 1985, at 11, neither of which require an exchange of articles between two parties. Furthermore, during prosecution, plaintiff focused a discussion on the meaning of the term "transaction." *See* Exh. 60, Applicant's Response dated Sep. 20, 1988. Notably absent from

---

**2.** "Transact" has been defined as "1: to prosecute negotiations: carry on business: NEGOTIATE ... 2: to carry out: EFFECT, PERFORM ... 3[:] HANDLE, EXCHANGE." Webster's Third New International Dictionary (unabridged) 2425 (1966). "Transaction" has been defined as "1: an act, process, or instance of transacting ... b: a communicative action or activity involving two parties or two things reciprocally affecting or influencing each other." *Id.*

the discussion was any statement that the term "transaction" was limited to an "exchange" or "transfer" of articles, as between two parties. In his Declaration pursuant to 37 C.F.R. § 1.132, plaintiff noted:

> An important aspect of the invention as claimed is the printing of bar coded records (tickets) *in coincidence or substantial coincidence with the entry of customer transactions and articles into controlled inventory, i.e. when an inventory record in [sic] born and the article descriptions are recorded.* Tickets with bar codes are generated under control of the inventory control processor that maintains the inventory records by adding and deleting or marking records in memory as successive customer transactions, each involving an indefinite number of articles of varying descriptions, pass into and out of controlled inventory. Because *generation of the bar coded tickets corresponds with the transactions passing into controlled inventory,* the correspondence of physical inventory and inventory records in memory is improved compared to known systems.

Exh. 61, Decl. of Herbert L. Markman, 37 C.F.R. § 1.132 dated June 15, 1994, at ¶ 3. Plaintiff emphasized the printing of bar codes coincident with passing articles into inventory, not with the "exchange" or "transfer" of articles. *See also* Report of John M. Mikula, at 2 (dated January 24, 1997) ("The barcode would be printed only in coincidence with the birth of an inventory control record in the computer system.").

The term "transaction" thus is not limited to an "exchange or transfer of articles between two different parties" but is reasonably interpreted to mean "the carrying out or performance of something." That would include identifying and placing something into inventory. A reasonable interpretation of the term "articles" is "items." Printing of bar codes occurs "in coincidence" with transactions when the bar codes are printed substantially at the same time as the transaction.

Based on the foregoing, the Court concludes that the claims, properly construed, relate to the printing of bar codes when an item to be inventoried is uniquely identified and entered into inventory. This is the broadest reasonable interpretation consistent with the specification and file history. Extrinsic evidence proving a more narrow "interpretation" was offered at trial, that is, the testimony of the inventor and his opinion witness, but the testimony was not persuasive. It did not comport with the above-mentioned statements from the specification and file history, which are the most reliable and relevant evidence on this issue. *See In re Morris,* 1997 WL 467688 at *8 (applicant must define claim language in the written description of the invention).

### 2. *Claim comparison*

Noel, Krause, Marathon, Stanley, Stein, Liberty Lister, Countmaster, and Thermopatch all teach the use of bar codes. Exhs. 11–18. Noel, Krause, Marathon, Stanley, Stein, and Liberty Lister teach the use of bar codes in connection with some form of inventory control system. Exhs. 11–18. Thermopatch and Countmaster suggest the use of bar codes and suggest inventory control. Exhs. 1, 15. Noel, Krause, Marathon, Stanley, Stein, and Liberty Lister teach the use of bar codes in connection with transactions. Exhs. 11–18. Noel, Krause, Marathon, Stanley, Stein and Thermopatch teach the *printing* of bar codes. Exhs. 11–18. The only difference between the prior art and the invention set forth in claims 1 and 7 of the '054 patent is that the prior art does not specifically teach printing bar codes *only* in coincidence with a dry-cleaning transaction in a retail dry-cleaning establishment. Exhs. 1 and 11–18.

### E. Obviousness in View of the Prior Art

The Board held that claims 1–15 were not patentable under 35 U.S.C. § 103. As evidence of obviousness, the Board relied upon either Noel or Krause, taken together with Lister, Countmaster, and Thermopatch. Claims 1, 7, 14, and 15 are representative of all the claims.

### 1. *Claims 1 and 14*

Claim 1 has been reproduced above. Claim 14 reads:

**40**

14. An inventory control and reporting system, comprising:

a data input device having switch means for encoding information related to sequential transactions, each of the transactions having articles associated therewith, said information including transaction identity data and data relating to the transactions;

a data processor including memory operable for recording said information, means for generating an inventory report and means for associating sequential transactions with unique indicia sequentially assigned to the transactions and for generating at least one report of said transactions, the unique indicia and the data relating to the transactions being reconcilable against one another;

a printer operable under control of the data processor to generate a written record for each of the sequential transactions, the written record including optically detectable bar codes printed only in substantial coincidence with each said transaction and at least part of the written record bearing a portion to be attached to said articles; and

at least one optical scanner for data communication with the data processor and operable to detect said bar codes on all articles passing a predetermined station.

The Court's conclusion, based on the foregoing analysis and the entire record, is that claims 1 and 14 would have been obvious to one of ordinary skill in the art at the time of the claimed invention, as evidenced by Noel or Krause.

Noel discloses an inventory control and reporting system for rolls of denim. Exh. 11. Photo 1 shows a weigh station where "packages of denim are processed to generate labels." The system includes a data input device, data processor, dot matrix printer, and scanner. *Id.* at 20–22. Noel's teaching of the entry of a roll of denim into inventory is a "transaction having items associated therewith" within the meaning of claim 1 and 14, consistent with both the customary usage of that phrase and the '054 patent's specification and file history. Noel teaches that after the roll is manufactured, inspected and grad-ed, a seven-digit pressure sensitive label is generated, at least part of which is to be placed on the roll. *Id.* at 20. Noel suggests that the printing of labels is to progress sequentially as each roll is prepared for entry into inventory. Noel does not suggest that the printing of labels is non-sequential. One of ordinary skill in the art would have known to print Noel's bar-coded label "only in coincidence" with the transaction of moving the roll of denim into inventory in order to make the system work properly. Printing prior to that time would generate needless bar-coded labels which were not associated with specific rolls of denim. Printing after that time would result in rolls moved into inventory without bar-coded labels. Noel also suggests local label printing to increase the speed and accuracy of inventory and shipping. Exh. 11 at 23. Noel's suggestion that on-site label printing will increase the speed and accuracy of inventory and shipping is true only if such printing occurs coincidentally with the entry of rolls into inventory.

Krause discloses an inventory control and reporting system used, for example, with a PC board repair facility to track work in progress and related transactions. Krause discloses a data input device, data processor, printer, and scanner. Bar codes are used to tag items for accuracy and speed. Exh. 12 at 139. Krause suggests that printing of bar codes for inventory control should occur when the inventory is introduced. Krause's teaching that "a specific bar-code may be required to be available on demand at the user's facility" suggests the printing of such bar codes when the need for them arises. *Id.* at 140.

Marathon, Stanley, and Stein—prior art offered at trial—show inventory control and reporting systems using bar codes and further evidence the obviousness of the claims. Marathon discloses a control and reporting system for registering runners in the New York Marathon. One of ordinary skill in the art would have known to print Marathon's bar-coded registration cards "only in coincidence" with the transaction of registering for the race in order for the registration system to function properly. Printing prior to that time would result in bar-coded registration

cards which were not associated with each runner. Printing after that time would result in runners entering the race and being processed through the race entry system without bar-coded registration cards. One of ordinary skill also would have known the applicability of the Marathon system to other inventory systems.

Stanley shows the use of bar code labels to identify and track patients and medicine. Because each label is printed as each patient is admitted, one of ordinary skill would have known to print the labels "only in coincidence" with the admission of patients to the hospital.

Stein discloses an inventory and reporting system for baggage. Labels are printed in response to operator entry of flight and destination. A coded label and serial baggage handle strip is printed coincident with the transaction of checking luggage. Printing prior to baggage check-in would generate needless bar-coded labels which would not be associated with flight and destination information for each passenger and his luggage. Printing after check-in would result in baggage processed without flight and destination information in bar-coded form.

These prior art references—Noel, Krause, Marathon, Stanley and Stein—teach to one of ordinary skill in the art at the time of the claimed invention the printing of bar codes "only in coincidence with transactions having articles associated therewith" as required by claims 1 and 14.

### 2. *Claims 7 and 15*

██ Claims 7 and 15 are limited to a retail dry-cleaning establishment and read as follows:

7. The system of claim 1 adapted for specific use in a retail dry-cleaning establishment, the articles being articles to be cleaned, and comprising additional optical scanners at a plurality of stations along a sequence of retail dry-cleaning operations including sorting, cleaning and delivery, the indicia and the descriptions of articles being reconcilable at each of said plurality stations for localizing said spurious additions and deletions.

15. The system of claim 14, adapted for specific use in a retail dry-cleaning establishment, the articles being articles to be cleaned, and comprising additional optical scanners at a plurality of stations along a sequence of retail dry-cleaning operations including sorting, cleaning to and from inventory.

The Court concludes that the subject matter of claims 7 and 15 would have been obvious to one of ordinary skill in the art, as evidenced by Krause and Noel, discussed above, in view of Liberty Lister, Countmaster, and Thermopatch.

Krause and Noel are discussed above and disclose inventory control and reporting systems, particularly in factory and warehousing environments. Furthermore, they also suggest the application of such systems to retail environments. Exh. 11 at 21; Exh. 12 at 212. As discussed above, both references suggest a system having bar codes printed only in substantial coincidence with transactions having articles associated therewith.

Liberty Lister teaches the benefits of using bar codes in the tracking and control of inventory, specifically in the environment of a retail dry-cleaning establishment. Exh. 13. Although Liberty Lister discloses a bar code based inventory control system using a stock of pre-printed bar code forms, it suggests the problem that individual forms can be lost with the result that their associated bar coded numbers will appear to be missing. *Id.*

Countmaster shows that it was known that maintaining a stock of paperwork for processing garments being left for dry-cleaning was costly, both as to the outside printing of this paperwork and in terms of possible misuse that could result in additional loss of revenue. *Id.* Countmaster indicates that savings result when such paperwork is printed "automatically." *Id.* Countmaster suggests further cost reductions because the elimination of this stock prevents misuse in preventing "freebies." *Id.* Countmaster teaches a solution to the security and cost problems confronting plaintiff by eliminating the availability of pre-printed forms and teaching the advantages of automatically printing paperwork—including receipts, claim checks, and clothing tags—when enter-

ing garments received for cleaning into inventory. *Id.*

Thermopatch shows the availability of printers that were able to locally print bar codes of sufficient clarity for reliable scanning in inventory control systems. Exh. 15. Thermopatch discloses an ink that remains sharp and scannable through launderings and drycleanings. *Id.*

■ In order to combine references, there must be some suggestion or incentive—whether express or implied—to make the combination. *In re Gorman*, 933 F.2d 982, 986 (Fed.Cir.1991); *GPAC*, 57 F.3d at 1581. However, the law does not require that the references be combined for the same reasons contemplated by the inventor. *In re Beattie*, 974 F.2d 1309, 1312 (Fed.Cir.1992)

One of ordinary skill in the art would have found the claimed invention obvious at the time of the claimed invention. One of ordinary skill would have been motivated to combine the references as the Board did. Each of the prior art references discussed above relates to bar codes and some sort of inventory control system. One of ordinary skill in the art would have known from the teachings of Noel or Krause, together with Liberty Lister, Countmaster, and Thermopatch to print bar codes in coincidence with dry-cleaning transactions as claimed.

The teachings of the additional prior art offered by the Commissioner and discussed in detail above further support this conclusion. Marathon, Stanley, and Stein, for example, illustrate the variety of applications for bar code inventory and reporting systems at the time of the claimed invention. As discussed above, there were appropriate printers, scanners, and software available to implement such systems. Moreover, as discussed above, one of ordinary skill in the art would have known how to do so.

Even absent the teachings of Countmaster, there is sufficient evidence in the teachings of the prior art discussed herein to support a determination of *obviousness in this case.* For example, Noel's system inventories and tracks rolls of cloth to be sold to customers. In view of Liberty Lister, one of ordinary skill would have found it obvious to modify

the Noel system to inventory and track articles to be dry-cleaned. Likewise, Krause's system inventories and tracks PC boards to be repaired. In view of Liberty Lister, one of ordinary skill would have found it obvious to modify the Krause system to inventory and track articles to be dry-cleaned.

None of the prior art references in this case—Liberty Lister, Noel, Stein, Stanley, Marathon, Krause, Countmaster, or Thermopatch—teaches away from Markman's claimed inventory control system. None of the references suggests that printing in coincidence with a transaction having articles would be unproductive.

### F. Secondary Considerations

Plaintiff asserted at trial that the teachings of the prior art were outweighed by the commercial success of this system, by satisfaction of a long-felt need, and by instances of copying by others. The evidence of these secondary considerations, however, was not persuasive enough to support the proposition for which it was offered.

■ Commercial success and acceptance in the industry will be given weight where the evidence shows both the fact of success and that the invention claimed in the patent is the reason for the success. *GPAC*, 57 F.3d at 1580. Evidence of relevant market share held by the patented product ordinarily is required, *see In re Huang*, 100 F.3d 135, 140 (Fed.Cir.1996), and there must be "proof that the sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter." *Id.*

■ Plaintiff testified that his company, Positek, has earned $19 million since 1984 in gross revenues from the sale of systems embodying his invention. Tr. Trans. at 137. He estimated that 11,000 more systems could be sold in the future:

Q. How did you arrive at that figure?

\* \* \*

A. There are—my best estimate, knowing the market base for many years, I believe there's 48,000 retail dry-cleaners in the

United States. 16,000 are very tightly—are very—relatively small, family-operated units, who are resistant to automation. That leaves 32,000 prospects.

Currently, about 10,000 of those 32,000 have some pricing machines that are similar to the Liberty Lister machine with or without inventory control. There's 10,000 of those out there. Most of them don't practice inventory control. That leaves 22,000.

Of the 22,000, half are interested in inventory control, and so there's 11,000 prospects who would be interested in buying the system of the invention as far as inventory control, using bar code as in the invention.

Q. How many systems have been sold by [your company] since 1984 which embodied the invention?

A. I believe about 1300.

Tr. Trans. at 137–38. Plaintiff also testified that he has received fees from several licensees of his invention. *Id.* at 139–46. Plaintiff's testimony was supplemented with Exhibit 41, showing Positek's sales of systems in the United States and Canada, and with several licensing agreements. Exhibit 41 reflects that 56.3% of Positek's systems sold have a bar code feature. Exh. 41. Plaintiff testified that there were "approximately 3200 current infringers" of his technology in the dry-cleaning field. Tr. Trans. at 147. Using these calculations, plaintiff estimates that his systems have a 40% share of the available market. *Id.* at 148. Plaintiff also testified that Positek's system has been endorsed by a trade association and by several customers. *Id.* at 150–52.

Plaintiff's testimony on these points was both speculative and conclusory. He provided no coordinating data to support his market share claim. Nor did plaintiff establish a nexus between his alleged commercial success and the merits of his claimed invention. *See id.* at 140. He presented no evidence that any of his sales were attributable to the fact that his system printed bar codes in coincidence with transactions. There was evidence that at least some of plaintiff's sales were due to factors such as the speed of his invention, most likely due to the firmware

board or the availability of high speed printers. Tr. Trans. at 172–75. And, there is evidence that the product endorsements plaintiff has received are related to considerations other than the merits of his claimed invention—such as the speed of plaintiff's system, the system's menu screens and reports, and plaintiff's customer support. Exh. 154. Plaintiff admitted to stating that his system had received "instant credibility with all the [National Cleaners Association] members" because the initial distribution of his product was through that Association. Tr. Trans. at 223–24; Exh. 50 at 8.

■ Next, Plaintiff asserts that his claimed invention filled a long-felt but unresolved need in the art. Establishing a long-felt need requires a showing that others skilled in the art in fact perceived a need and that this perception persisted over a long period of time without resolution by the prior art. *Huang,* 100 F.3d at 139 n. 5. Plaintiff did not prove that others perceived such a long-felt need.

Finally, plaintiff asserts that others copied his invention. As evidence, plaintiff adduced Exhibits 160–173, photocopies of receipts having barcodes. Plaintiff testified that they were "copies of literature and tickets ... where we believed that there's copying—I believed that there's copying taking place of the invention. Some of these I've had formal studies done by [a] law firm to determine if there is copying or not; some I have not." Tr. Trans. at 157. The photocopies are entitled to very little weight. Plaintiff's opinion that his system was infringed by others is of little weight, as he admittedly is not an expert in patent law. *See* Tr. Trans. at 76–77. There is insufficient evidence to support plaintiff's assertion of copying by others.

## CONCLUSION

Plaintiff's claimed invention would have been obvious to one of ordinary skill in the art at the time he applied for a patent. Plaintiff's limited objective evidence of non-obviousness is insufficient to establish patentability in view of the strong case of obviousness. The decision of the Board will be

**44**

upheld. An appropriate order will be issued with this memorandum.

### ORDER AND JUDGMENT

For the reasons set forth in a memorandum issued today, judgment is hereby entered for the defendant and against the plaintiff. So **ordered** this 3d day of December 1997.